Commonwealth *v.* Moyer, Appellant.
Commonwealth *v.* Byron, Appellant.

182

Argued May 26, 1947. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, and STEARNE, JJ.

*Jacob Sapovits*, with him *Anthony G. Kapourelos, Samuel M. Tollen* and *J. Harold Hughes,* for appellants.

*C. William Kraft, Jr., District Attorney,* with him *R. Paul Lessy* and *Raymond R. Start,* Assistant District Attorneys, for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, June 30, 1947:

Charles Frederick Moyer and William Paul Byron were jointly tried for the murder of Harvey Zerbe, which occurred during the perpetration of a robbery. The jury convicted them of murder in the first degree and imposed the death penalty. On the night of July 13, 1946, the defendants while in a taproom in Chester, Pa., "decided to go out and rob a filling station or some place." Byron, armed with a .32 caliber Smith & Wesson revolver and Moyer, armed with a .32 caliber Royal automatic pistol, cruised along MacDade Blvd., Delaware County, in a car which they had previously stolen, with the specific intent of carrying out their conspiracy. At or about 11 P. M. they selected as a suitable site to rob, a gasoline station located on MacDade Blvd. and Sylvania Ave., Delaware County, which was owned and operated by one Earl Shank. They drove their stolen car into the gasoline station, between the curb and the "island", where they were approached by Harvey Zerbe, who was employed as a gasoline attendant. Byron was behind the wheel and Moyer was slumped in the front seat beside Byron so that he was unobserved. When Zerbe inquired of their needs, Moyer pushed open the car door, pointed his weapon at Zerbe and informed him it was a "hold-up". Moyer got out of the car and put his loaded gun against Zerbe's person and ordered him to advance toward the building. Byron remained in the car. At the time, Earl Shank, the owner of the station, was leaning in front of the doorway of the building on the premises. He was not immediately observed by Moyer whose vision was obscured by a large Panama hat which he wore pulled down over his eyes.

As Moyer was marching Zerbe toward the building, Zerbe moved sidewise to the left. Moyer then looked up and saw Shank. Moyer immediately fired at Shank but missed. Shank who had a .38 caliber revolver in his left pocket, which he obtained from Zerbe five minutes prior

to the perpetration of the robbery,[1] fired at Moyer five times. Two of the shots hit Moyer, one in the shoulder and the other in the chest. Moyer then shot twice at Shank and retreated to the automobile. When he reached the car he shot again and about that time Byron shot. Moyer's last shot was aimed at Shank but it was alleged by the Commonwealth that the bullet hit Zerbe, who was then in the line of fire. Zerbe fell mortally wounded. Shank testified that while the exchange of shots took place, he "picked up a three-pound maul, and as I did a shot came in the doorway . . . I dropped the maul and grabbed the telephone." He was asked: "When you picked up the telephone had you seen Zerbe go down?" He replied: "No, sir." He stated: "Before I completed the call, when I was telephoning the police, Mr. Zerbe was looking in the window at me when I started to make the telephone call to the police." When he was asked what happened after he finished making his call, he answered: "I went to go out the door and Mr. Stauffer was standing in front of the door and he said: '. . . Are you hurt, are you hurt?' I said to him: 'No.' . . . I didn't know he [Zerbe] was hit yet. Just then someone said there was a man shot." I looked over to see who it was and telephoned to get the Milmont ambulance." It was "Harvey Zerbe . . . lying on his back." After the shooting, Byron and Moyer escaped in the stolen car.

Zerbe faced Shank throughout the shooting. Zerbe was shot in the back from the direction of Byron and Moyer. The bullet passed completely through his body. An eye-witness, Marion Stauffer, saw Moyer's arm drop immediately after the shooting (as having just completed the shot) and saw Zerbe then fall to the ground. After Zerbe was shot, a bullet that was identified as having come from Moyer's gun was found underneath Zerbe's prostrate body. Shank did not shoot in Zerbe's direction.

---

[1] There had been other recent robberies in that vicinity and Shank had been warned by the police to be prepared to defend himself.

In Moyer's confession he said that when he was at the gasoline station and saw Zerbe approach the car, he [Moyer] said "Put your hands up; this is a hold-up." This man "was sweeping up or doing something like that." Moyer said he "pointed the gun at him" and told him he "wanted his money." Byron was then at the wheel of the car. The man that came whom Moyer had addressed, replied "all right" and then Moyer marched him towards the building and he told him to get the money. Moyer said, "I was walking behind him with the gun on him . . . then the other fellow started to shoot." By "the other fellow" he evidently meant Shank, who was "in the doorway." He said he [Shank] shot twice and hit him both times, once in the shoulder and in the chest. Zerbe, who had been ahead of Moyer, started to run toward the left hand corner of the building. Moyer then started shooting. He fired four times in rapid succession. He said he "was aiming at the fellow in the doorway." He was asked: "While you were firing what did you notice happen if anything?" "A. I saw the fellow that was hit falling. Q. That is the fellow that you had been marching along with the gun pointed at him? A. Yes." Moyer was also asked: "Then what happened?" He answered: "I turned around, ran around, jumped up, got inside of the car, and we pulled away." As he pulled away, he heard the man who had been shot and who was then lying on the ground "moaning."

The Commonwealth claims that it proved beyond a reasonable doubt that the bullet which killed Zerbe was fired by the defendant, Moyer. After Zerbe was shot down and these two defendants escaped from the scene, a .32 caliber bullet was found beneath Zerbe's body. The inference was legitimate that this was the bullet that passed through Zerbe's body. M. E. Williams, special agent of the F. B. I., testified as follows: "Of the three weapons I examined, this bullet, State's exhibit 9 [the .32 caliber, Royal bullet found beneath Zerbe's body]

could only have been fired in the automatic pistol, State's exhibit 11 [Moyer's gun]." Defense counsel asked: "Could you tell us whether or not the laboratory of the Federal Bureau of Investigation is equipped to test bullets that have gone through objects?" He answered: "Certainly." "Q. Such as wood? A. Yes, sir. Q. And bodies? A. Yes, sir." As we hereafter point out in this opinion, it is quite immaterial in the question of the guilt of these defendants whether or not the fatal bullet was fired by Moyer or by Zerbe's employer in repelling Moyer's murderous attack upon him and Zerbe in the attempted perpetration of a robbery.

Dr. John H. Turner testified for the Commonwealth that an examination of Zerbe's body disclosed "a bullet wound on his back and penetrating through the abdomen on the left side; it went in on the right and came out on the left." He was asked: "Will you tell us where the point of entrance was?" He answered: "The point of entrance was two inches to the right of the fourth lumbar vertebrae on the right side." He distinguished the entrance "because of the dark area on the skin" which was "in the back on the posterior surface, and on the front there was none at all." He also testified that the powder burns indicated that the victim was not at "close range" and that the revolver shot in relation to the object shot was "from a distance". The witness further stated that a "reflected bullet" could not have caused the victim's mortal injury. John Daniel Stauffer a resident near the gasoline station, testified that he had heard the exchange of shots and saw the defendants' car "coming out of the station", it "was going very fast, as fast as it could go." He went over as fast as he could and saw Zerbe "lying on his back." He said Shank was still on the telephone when he got into the doorway.

The defendants were apprehended on November 7, 1946, and were subsequently convicted of murder in the first degree. Each defendant filed a motion for a new trial After these motions were refused in due course, this appeal followed.

The first assignment complains that the charge of the court "removed from the jury's consideration a possible verdict of acquittal", by the following language:

". . . I understand counsel here asked for acquittal, although not stressing the point, but that is entirely a matter for you, you will reach a verdict and it is your verdict but we do not know why the question was ever propounded to you at all, why they should be acquitted."

". . . but certainly not for any acquittal of any kind whatsoever; under the evidence in the case, we will not submit that to you at all."

This language was ill chosen and if it was not rectified by other portions of the charge, it might require a reversal. However, we have frequently said that a judge's charge must be considered in its entirety and that error cannot be predicated on certain isolated excerpts from the charge. See *Com. v. Malone,* 354 Pa. 180; *Com. v. Glenn,* 321 Pa. 241; *Com. v. Bryson,* 276 Pa. 566. A reading of the entire charge in this case reveals that the jury could have been in no doubt that it was their duty to acquit the defendant if the Commonwealth failed to establish guilt beyond a reasonable doubt. For example, the court said:

"Where a reasonable doubt exists it is the property of the defendant and must result in an acquittal."

"Of course it must follow, if you would be of the opinion under all the evidence in this case that it was an accidental killing of Zerbe by Shank, it is possible that these defendants may not be found guilty of murder in the first degree, or may not be found guilty at all . . ."

"We are not indicating to you what your verdict should be at all. We have told you that you have authority to say whether this was murder in the first degree, murder in the second degree or voluntary manslaughter, but we cannot conscientiously say to you that we agree with any suggestion made by counsel for the defendants that the men ought to be set free on the

charges preferred against them. However, we are leaving the matter entirely to you. We are expressing our opinion, and you will not be influenced by anything we will say, but we are quite sure you look to the judge for guidance . . . but we cannot acquiesce in conscience with the suggestion that these men should be acquitted. They are charged with this offense; the matter is entirely with you, and you are free to do as you please."

In *Com. v. Bloom*, 88 Pa. Superior Ct. 93, this court said: ". . . a judge may express his opinion regarding the evidence, and in some cases it may be his duty so to do, but this should be so done as not to withdraw the evidence from the consideration and decision of the jury." See also *Com. v. Cunningham*, 242 Pa. 609, in which this court, speaking through Chief Justice FELL, said: This court will not reverse a conviction of murder in the first degree because a judge expresses his opinion as to the guilt of the defendants if "the jurors must have understood that they were entirely free to form their own judgment." The charge in the instant case does not justify the claim that the jury was not free to return whatever verdict the evidence when weighed by the jury called for.

The second assignment of error is based on the excerpt from the charge of the court in which the jury was instructed that: "All of the participants in an attempted robbery are guilty of murder in the first degree if someone is killed in the course of the perpetration of the first-named crime. That is the law of the Commonwealth of Pennsylvania." The appellants challenge that statement and say that the issue in this case is whether or not the decedent met his death by a wound inflicted by the defendant Moyer or by the garage owner Shank.

This assignment of error poses the question whether or not these defendants can legally be convicted of murder if the bullet which killed Zerbe came from the revolver fired by the latter's employer in an attempt by him to frustrate the attempted robbery. We have no

doubt that even under these facts, which facts the Commonwealth does not concede, the complained of conviction was proper.

A man or men engaged in the commission of such a felony as robbery can be convicted of murder in the first degree if the bullet which causes death was fired not by the felon but by the intended victim in repelling the aggressions of the felon or felons. This is a question which apparently has never before arisen in this Commonwealth and has arisen elsewhere only rarely. Our Act of June 24, 1939, P. L. 872, section 701, 18 PS 4701, reads as follows: "All murder which shall be . . . committed in the perpetration of, or attempting to perpetrate any arson, rape, robbery, burglary, or kidnapping, shall be murder in the first degree." This section is, with the addition of the word "kidnapping" and with a negligible change in phraseology, a re-enactment of the corresponding provision of the Criminal Code of March 31, 1860, P. L. 382, and of later Acts and of the Act of 1794.[2]

The numerous states which have copied this Pennsylvania statute, (including the states of Massachusetts, New York, Connecticut, New Jersey and Michigan) all use in their respective statutes the word "murder" instead of the word "homicide" for the reason that a killer in the malicious perpetration of one of the specified felonies has committed common law murder. The felon obviously possesses that "wickedness of disposition, hardness of heart, cruelty and recklessness of consequences and a mind regardless of social duty" (*Commonwealth v.*

---

[2] Wharton's Criminal Law, Vol. I, 12th Ed., page 730, section 503, says of the Pennsylvania statute on this phase of murder: "The earliest of these statutes was that of Pennsylvania, and was drafted by the first Mr. William Rawle and Mr. William Bradford, jurists, as distinguished for their humanity as for their legal capacity. As the Pennsylvania statute has been reproduced in a majority of the states in the Union, it forms the basis of most of the adjudications which have been given under this head." Wharton is evidently referring to the Act of April 22, 1794, 3 Smith Laws 187, section 2.

*Drum,* 58 Pa. 9) which constitutes malice. Blackstone, Book IV, section 199, says that "The grand criterion which now distinguishes murder from other killing" is that malice which is "the dictate of a wicked depraved and malignant heart." This court said in *Commonwealth v. Kelly,* 333 Pa. 280, 287, 4 A. 2d 805, "To this Commonwealth one must answer as a malicious criminal for any fatal injury he here causes a human being by anything done by him intentionally or unintentionally during the commission or attempted commission of any of the specified felonies, for malice is the mainspring of his outlawed enterprise and his every act within the latter's ambit is imputable to that base quality. Such a rule is essential to the protection of human life." In that case we held, as we had previously in *Commonwealth v. Lessner,* 274 Pa. 108, 118 A. 24, that "when in the commission or attempted commission of a robbery there is 'no break in the chain of events' between the felony and the shooting which caused death, even though 'the discharge [of the gun] was unintentionally caused [by the felon] while struggling with his victim, or with a third party who came to the latter's assistance,' the defense of accidental killing is inadmissible and the homicide is, under the statute, 'murder of the first degree.' "

The doctrine that when malice is the mainspring of a criminal act the actor will be held responsible for any consequence of his act though it was not the one intended was recognized centuries ago when it was held that, quoting from Blackstone, Book IV, page 1599, section 201, "if one shoots at A and misses him, but kills B, this is murder, because of the previous felonious intent, *which the law transfers from one to the other."* (Italics supplied). It is equally consistent with reason and sound public policy to hold that when a felon's attempt to commit robbery or burglary sets in motion a chain of events which were or should have been within his contemplation when the motion was initiated, he should be held responsible for any death which by direct and

almost inevitable sequence results from the initial criminal act. For any individual forcibly to defend himself or his family or his property from criminal aggression is a primal human instinct.[3] It is the right and duty of both individuals and nations to meet criminal aggression with effective countermeasures. Every robber or burglar knows when he attempts to commit his crime that he is inviting dangerous resistance. Any robber or burglar who carries deadly weapons (as most of them do and as these robbers did) thereby reveals that he expects to meet and overcome forcible opposition. What this court said in *Commonwealth v. LeGrand*, 336 Pa. 511, 518, about burglars, applies equally to robbers: "Every burglar is a potential assassin and when his felonious purpose encounters human opposition his *intent to steal* becomes an *intent to kill* and any weapon he finds at hand becomes a weapon of murder." Every robber or burglar knows that a likely later act in the chain of events he inaugurates will be the use of deadly force against him on the part of the selected victim. For whatever results follow from that natural and legal use of retaliating force, the felon must be held responsible. For Earl Shank, the proprietor of a gas station in Ridley Township, Delaware County, which at 11 P. M. on July 13, 1946, was being attacked by armed robbers, to return the fire of these robbers with a pistol which he had at hand was as proper and as inevitable as it was for the American forces at Pearl Harbor on the morning of December 7, 1941, to return the fire of the Japanese invaders. The Japanese felonious invasion of the Hawaiian Islands on that date was in law and morals the proximate cause of all the resultant fatalities. The Moyer-Byron felonious invasion of the Shank gas station on July 13, 1946, was likewise the proximate cause of the resultant fatality.

---

[3] "Such homicide as is committed for the prevention of any forcible and atrocious crime is justifiable by the law of nature; and also by the law of England." 4 Blackstone, section 181.

If *in fact* one of the bullets fired by Earl Shank in self-defense killed Harvey Zerbe, the responsibility for that killing rests on Moyer and his co-conspirator Byron, who had armed themselves with deadly weapons for the purpose of carrying out their plan to rob Shank and whose murderous attack made Shank's firing at them in self-defense essential to the protection of himself and his employees and his property. If, for example, a father sees his child being kidnapped and opens fire, as any normal father would be expected to do if he had a gun available, and if the bullet which he fires at the kidnapper inadvertently kills the child, the death of the child is properly attributable to the malicious act of the kidnapper. The principle which sustains this conclusion is expressed by Bishop on Criminal Law, 9th Ed., Vol. 2, section 637, page 480, as follows: "It is a rule both of reason and law that whenever one's will contributes to impel a physical force, whether another's, his own, or a combined force proceeding from whatever different sources, he is responsible for the result, the same as if his own unaided hand had produced it. The contribution, however, must be of such magnitude, and so near the result, that sustaining to it the relation of contributory cause to effect, the law takes it within its cognizance."

Stephen's History of the Criminal Law of England, Vol. 3, page 21, says that at common law "murder was homicide with malice aforethought and that the latter consisted of any of the following states of mind: 1. . . . 2. . . . 3. . . . 4. An intent to commit any felony whatever." Blackstone, Book IV, pages 192-193, says: "When an involuntary killing happens in conseqence of an unlawful act it would be either murder or manslaughter according to the nature of the act which occasioned it, but in consequences naturally tending to bloodshed it will be murder."

In *Keaton v. State*, 57 S. W. 1125, the Court of Criminal Appeals of Texas held that where the defend-

ant and others went to rob a train, and, after stopping it, forced the fireman to the door of the express car, after being warned that some one would probably commence shooting at them from the rear of the car, and persons resisting the attempted robbery, and *intending to kill the robbers, shot and killed the fireman,* the defendant was held guilty of murder.

In the case of *Taylor v. State,* 55 S. W. 961, which grew out of the same train robbery, it was likewise held that the defendant was properly convicted of murder in the first degree. The court said in that case, "The whole question here is one of causal connection. If the appellant here set in motion the cause which occasioned the death of deceased, we hold it to be a sound doctrine that he would be as culpable as if he had done the deed with his own hands." In Bishop on Criminal Law, Vol. 2, section 657, page 500, it is stated: "Any employment of unlawful force, whereby the life of a human being is taken, whether this result was intended or not, is a felonious homicide." In section 679 it is stated: "Whenever one without legal excuse or palliation does what is directly and immediately dangerous to life, any homicide which results therefrom, whether intended or not, is deemed by the law to have proceeded from malice aforethought and is murder, not manslaughter." In *People v. Manriquez,* 206 P. 63, the Supreme Court of California held that homicide, committed in the perpetration of a robbery, was murder in the first degree, not withstanding defendant's claim that the pistol went off when his victim grabbed at it.

In the so-called "Anarchists' Case", *Spies et al. v. People* (1887) 122 Ill. 1, 12 N. E. 865, 3 Am. Stat. 320, it was held that any act done by a party to an unlawful conspiracy, in furtherance of and naturally flowing from the common design, is the act of each and all of the conspirators, (1) even though the conspirator who did the act cannot be identified; or (2) though the defendant may have been absent; or (3) though the act charged

may not have been arranged for; or (4) was unauthorized in point of time, place, occasion or instruments; or (5) was not anticipated, if the conspirators either did or ought to have anticipated the result, although they did not contemplate the means.

The man who hurled the deadly bomb was never identified and there was no direct proof that he was ever in privity with the defendants and there was only circumstantial proof that the defendants' inciting of others to overthrow the social order by violent methods and to kill law officers was a contributing factor in the throwing of the destructive projectile.

The Illinois Supreme Court in affirming the judgment and the death sentence against seven of the defendants held that whether the fatal act "naturally flowed" from the criminal design of the defendants was a fact for the jury's determination. It quoted the following from I Bishop Criminal Law, section 636: "A man may be guilty of a wrong which he did not specifically intend, if it came naturally or even accidentally through some other specific or a general evil purpose. When therefore, persons combine to do an unlawful thing, if the act of one proceeding or growing out of the common purpose terminates in a criminal result, though not the particular result meant, all are liable." The court also said: " 'He who inflames people's minds, and induces them by violent means to accomplish an illegal object, is himself a rioter, though he takes no part in the riot.' Reg. v. Sharpe, 3 Cox, Crim. Cas. 288. 'One is responsible for what wrong flows directly from his corrupt intentions. . . . If he set in motion the physical power of another, he is liable for its result. If he contemplated the result, he is answerable, though it is produced in a manner he did not contemplate. . . . If he awoke into action an indiscriminate power, he is responsible. If he gave directions vaguely and incautiously, and the person receiving them acted according to what he might have forseen would be the understanding, he is responsible.'

1 Bish. Crim. La., section 641. . . . It was a question for the jury whether, . . . the attack upon the police at the Haymarket 'was so connected with the inflammatory language used that they cannot be separated by time or other circumstances.' "

In *Johnson v. Alabama,* 38 So. 182, 2 L. R. A. (N. S.) 897, it was held by the Supreme Court of Alabama that one who, by interfering in aid of his insane parent, whom officers are attempting to arrest, frees his hands, and enables him to kill one of the officers, is guilty of murder. "The person who unlawfully sets the means of death in motion . . . is the guilty cause of the death at the time and place at which his unlawful act produces its fatal result; . . .": GRAY, J. in *Com. v. Macloon,* 101 Mass. 1, 100 Am. Dec. 89.

In the law of *torts,* the individual who unlawfully sets in motion a chain of events which in the natural order of things results in damages to another is held to be responsible for it. In *Boggs v. Jewell Tea Co.,* 266 Pa. 428, 433, this court said, quoting from 1 Thompson on Negligence, section 52, "Whoever does a wrongful act is answerable for all the consequences that may ensue in the ordinary and natural course of events, though such consequences be immediately brought about by intervening causes, if such intervening causes were set in motion by the original wrongdoer." See also, *Cameron v. Citizens Traction Co.,* 216 Pa. 191, and *King v. Lehigh Valley R. R.,* 248 Pa. 255.

In *Insurance Co. v. Boon,* 95 U. S. 117, the U. S. Supreme Court held that when in a Missouri city in 1864 an armed force of Confederates attacked the city and the commander of the United States forces of the city upon realizing that he could not successfully defend the city, set fire to the city hall in order to prevent military stores in that hall from falling into the Confederate hands and the fire spread from the city hall to neighboring properties destroying the property of one Boon who had a policy of insurance upon the goods in

that property, the proximate cause of the fire which destroyed the plaintiff's property was "the rebel invasion and military or usurped power. The fire occurred while the attack was in progress, and when it was about being successful. The attack, as a cause, never ceased to operate until the loss was complete. It was the causa causans which set in operation every agency that contributed to the destruction. It created the military necessity for the destruction of the military stores in the city hall, and made it the duty of the commanding officer of the Federal forces to destroy them. His act, therefore, in setting fire to the city hall, was directly in the line of the force set in motion by the usurping power, and what that power must have anticipated as a consequence of its action. . . . It was one of a continuous chain of events brought into being by the usurped military power, —events so linked together as to form one continuous whole." The court held that the loss by the fire which destroyed plaintiff's property was excepted from the risk undertaken by the insurers.[4]

This same principle is illustrated in the so-called "Squib Case" of *Scott v. Shepherd*, 2 William Blackstone's Rep. 892. In that case, there was instituted an action of trespass for tossing a lighted squib against the infant plaintiff and striking him on the face and so burning one of his eyes that he lost the sight of it. The facts were that on the 28th of October 1770, defendant threw a lighted squib made of gunpowder from the street into the market house. A large concourse of people were assembled there. One Willis to prevent injury to himself and to the goods of one Yates, grasped the lighted squib and threw it across the market house where it

---

[4] The policy contained the following stipulation: "Provided always and it is hereby declared, that the company shall not be liable to make good any loss or damage by fire which may happen or take place by means of any invasion, insurrection, riot, or civil commotion, or of any military or usurped power, or any loss by theft at or after a fire."

fell upon one Ryal. The latter, to save his own goods from being injured, took up the lighted squib and threw it to another part of the market house and struck the plaintiff in the face, putting out one of his eyes. In that case, Justice Gould said, ". . . the defendant may be considered in the same view as if he himself had personally thrown the squib in the plaintiff's face. The terror impressed upon Willis and Ryal excited self-defense, and deprived them of the power of recollection. What they did therefore was the inevitable consequence of the defendant's unlawful act." Chief Justice DeGrey said, "The throwing the squib was an act unlawful and tending to affright the bystanders. So far, mischief was originally intended; not any particular mischief, but mischief indiscriminate and wanton. Whatever mischief therefore follows, he is the author of it;—*Egrediturpersonam*, as the phrase is in criminal cases. And though criminal cases are no rule for civil ones, yet in trespass I think there is an analogy. Every one who does an unlawful act is considered as the doer of all that follows; if done with a deliberate intent, the consequence may amount to murder . . ." The court held that an action of trespass was maintainable against the defendant Shepherd whose unlawful act started the squib on its journey through two other hands to the eyes of the plaintiff.

In *Welser et al. v. United Gas Improvement Co.,* 304 Pa. 227, 155 A. 561, which involved the question of the proximate cause of an injury in a tort case, this court said "the defendant's employees were responsible for a situation which would naturally cause the [police] officer to act as he acted in this case." We quoted the following from *Lane v. Atlantic Works,* 111 Mass. 136, 139, "The act of a third person, intervening and contributing to a condition necessary to the injurious effect of the original negligence, will not excuse the first wrongdoer, if such act ought to have been foreseen. The original negligence still remains a culpable, direct cause of the injury."

There is no reason why the principle underlying the doctrine of proximate cause as illustrated in three civil cases just cited should not apply to criminal cases also. Chief Justice DeGrey, in the squib case, supra, showed that he regarded the analogy between civil and criminal cases in which individuals are injured or killed as being so close that the principle of proximate cause applied to both classes of cases.

The second assignment of error is overruled. The third assignment of error is based on another excerpt from the charge of the court in which the court said: ". . . the contention of the Commonwealth is . . . that that was the bullet that caused the death of Zerbe, that it was from an automatic revolver in the hands of Moyer, and that Byron is in the picture because they started out to rob, and they intended to rob this particular place, they were working in concert, and if either one of them were to kill a person in the perpetration of a robbery or an attempt to commit robbery, they are both equally culpable." The objection here appears to be that the court made a statement as to a fact in issue, to wit, that the bullet which caused the death of Zerbe was from the automatic pistol "in the hands of Moyer." We do not find that the court deprived the jury of its right to determine who fired the bullet which killed Zerbe. Furthermore, as we have already stated, it is immaterial whether the fatal shot was fired by Moyer or Shank. The third assignment of error is overruled.

The fourth assignment of error is based on an excerpt from the charge of the court stating that the ballistic expert gave "his professional opinion about the calibre of the bullet . . . all for the purpose of showing . . . there was no doubt that was the bullet which passed through the body of the deceased." Under our view of the case, it is immaterial whether or not *that* was the bullet which passed through the body of the deceased. The fourth assignment of error is overruled.

The fifth assignment of error also relates to what the court said as to the identity of the fatal bullet.

Under our view in this case, the identity of the bullet is immaterial.

The sixth assignment of error is based on the following excerpt from the charge of the court:

"Here is a man who is deceased, Zerbe, thirty-nine years of age, a family man, working gainfully, stricken down in the vigor of life by men of the reputation of these men, according to evidence introduced here, habitual criminals, who were seeking to gain unlawfully, taking the law into their own hands . . ."

Appellants argue that the minds of the jurors were inflamed and prejudiced when the court referred to the defendants as "habitual criminals." For the purpose of enabling the jury to impose the appropriate penalty on these defendants in the event of their being adjudged guilty of murder in the first degree, the Commonwealth offered records showing that Byron had been convicted of twenty-five robberies and one rape and Moyer had been convicted of twenty-six robberies and five burglaries and one rape. In the light of these facts, the trial judge's characterization of the defendants as "habitual criminals" was only a harmless supererogatory indulgence on his part. The sixth assignment of error is overruled.

The seventh assignment of error is based upon the following excerpt from the charge of the court:

"These indictments have been offered to show what type these men were on this occasion and had been for some time before."

We find no reversible error in this excerpt. This assignment of error is overruled.

The eighth assignment of error is based on "the charge of the Court from page 463a to 488a which repeats the argument of the Commonwealth exclusively and is prejudicial, misleading and biased." This assignment of error is not made in accordance with Rule 22. See *Tate-Jones & Co., Inc. v. Union Electric Steel Co.,* 281 Pa. 448, 457. Because of this violation of Rule 22 and because of its lack of intrinsic merit, this assignment of error is disregarded.

That certain excerpts from the trial judge's charge are erroneous is clear. That any charge must be judged in its entirety is equally clear. When so judged the charge of this case did not amount to a denial to these defendants of a fair trial. That these defendants are guilty of murder in the first degree and deserve the penalty of death is a statement on which the evidence casts no doubt. What the Superior Court said in speaking through Judge RENO *in Commonwealth v. Blose,* 160 Pa. Superior Ct. 165, 50 A. 2d 742, applies to the instant case, to wit: ". . . where the evidence of guilt is overwhelming, the rule [as to harmless error] has been applied and the conviction sustained, thereby promoting the causes of justice without harm to the defendant's legal right to fair trials."

The judgments are affirmed and the record is remitted so that the sentences may be executed.