783 So.2d 1129 (2001)
Cesar Alexander REYES, Appellant,
v.
The STATE of Florida, Appellee.
No. 3D98-2959.
District Court of Appeal of Florida, Third District.
March 28, 2001.
Rehearing Denied May 16, 2001.
*1131 Bennett H. Brummer, Public Defender and Suzanne M. Froix, Assistant Public Defender, for appellant.
Robert A. Butterworth, Attorney General and Frank J. Ingrassia, Assistant Attorney General, for appellee.
Before SCHWARTZ, C.J., and JORGENSON and FLETCHER, JJ.
SCHWARTZ, Chief Judge.
This case involves an all-too-common, all-too-tragic feature of modern American urban life. On August 19, 1995, a young woman named Evangelina Ramirez and her three-year-old nephew, Bernabe Ramirez, were visiting a park in Miami when they were caught in a hail of bullets fired at each other by members of rival youth gangs in a fight over a girl. Bernabe was killed and Evangelina seriously wounded. This appeal challenges various convictions arising from the incident imposed upon Carlos Reyes after a jury trial. The more difficult legal problems presented arise from the fact that Reyes did not fire the shots which struck the victims.[1] Rather, the state contendedand the jury found that Reyes started the deadly melee by firing an automatic at two opposing gang members, including Daniel Espinosa, who, in returning fire with a shotgun, actually hit them.
There is little, if any, controversy about the operative facts, which are fairly stated in the appropriate light most favorable to its side in the state's brief:
On August 19, 1995, Evangelina Ramirez and her three year old nephew, Bernabe Ramirez, went out to a local store in Little Havana to buy candy. After purchasing the candy, Bernabe wanted to go into the nearby Riverside Park. Evangelina observed people playing basketball and observed a person in a white car get out of the vehicle and argue with one of the persons playing basketball. Evangelina then noticed an individual running toward the basketball court shooting a handgun with his arm stretched out straight. Shots were fired by this individual and Evangelina identified the Defendant as looking like the person with the weapon.
Evangelina was shot in the leg and right hand and lost significant mobility in her right hand. Bernabe died from a gunshot wound striking his chest. Bernabe's death resulted from a projectile that hit his chest that was consistent with being fired from a shotgun.
* * *
Hugo Paniagua testified that in August of 1995, he, together with Roberto Campos, Oreste Campos, Denilo Chavez and Daniel Espinosa were members of a gang known as the Second Street Fellows. Hugo also identified an individual known as Felix Cierra and the Defendant as members of a rival gang known as the Latin Kings. Riverside Park was the home "turf" of the Latin Kings.

*1132 On August 19, 1995, Hugo went to the beach with Denilo and Oreste. On their way home from the beach, they ran into Espinosa, who advised them of a recent argument that he had with two Latin King members, one of whom was the Defendant. Espinosa stated that he ran into the Defendant and Felix Cierra and Felix advised Espinosa that he wanted to fight Hugo.
Defendant also yelled at Espinosa that "Almighty don't love nobody!" Hugo decided to go to Riverside Park to confront the Latin Kings. Hugo decided to take a shotgun with him because Defendant had previously fired a gun at Roberto a month or two prior to August 19, 1995. Hugo, Denilo, Oreste, Roberto, and Espinosa then proceeded to Riverside Park.
Upon arriving at Riverside Park, Hugo exited the vehicle and the remaining members followed him. No one was armed at the time, but Hugo held a lighter in his hand in order to maintain a good grip. Hugo was not wearing a shirt or a bullet proof vest. Hugo punched Felix in the face. Defendant then started firing a gun at Hugo. Hugo heard five or six shots and a few seconds later, heard a loud boom from another gun. Hugo ran out of the park and shortly thereafter observed Oreste's car drive away and he got in the car and went home.
* * *
Roberto Campos testified that as the Defendant was shooting, Roberto and Espinosa retreated to their car. Roberto fell in a nearby water hole and Defendant was near the front of the car. Espinosa removed the shotgun from the car and the shotgun initially discharged, breaking the rear window of the car. Two more shots were fired from the shotgun and Defendant backed away while keeping his weapon pointed at Espinosa. Espinosa testified that he fired the shotgun because he feared for his life. Espinosa further stated that it was approximately ten seconds of time between Defendant's first shot to the initial shotgun blast.
After trial, the jury convicted Reyes of manslaughter of Bernabe Ramirez with a firearm as a lesser included offense of second degree murder (count I), aggravated battery of Evangelina Ramirez with a firearm as charged in count II, aggravated assault of Hugo Paniagua with a firearm as a lesser included offense of attempted second degree murder (count III) and attempted voluntary manslaughter of Daniel Espinosa with a firearm as a lesser included offense of attempted second degree murder (count IV).
For the reasons which follow, we uphold the validity of the charges against Reyes as they relate to Bernabe and Evangelina Ramirez, but, because of various trial errors, prominently including the admission of prejudicial evidence against him, order a new trial on all offenses.

I.
Perhaps the most significant question raised in this appeal is the underlying permissibility of holding Reyes criminally responsible, as he was in his convictions for manslaughter of the child and aggravated battery of the aunt, for a death and injuries which were physically effected by one of his antagonists.[2] We have concluded, *1133 however, that Reyes could properly be convicted of those offenses and thus that motions for judgments of acquittal as to them were correctly denied on the ground that each participant in a mutually-agreed-to-gun battle in a public place may be held accountable for any death or injury to an innocent person which results from that confrontation.[3],[4]
This principle has been specifically recognized in Florida in March v. State, 458 So.2d 308 (Fla. 5th DCA 1984), which, like this case, arose out of a shootout between offenders[5] which resulted in the death of an innocent bystander by a bullet from the gun of a co-participant who claimed self-defense. In rejecting a claim of non-responsibility by those who shot and missed, the court held that
[b]ecause all three parties were engaged in the same felonious activity (the shootout) their participation in the episode would have been sufficient to support a finding that they were aiders and abettors to second degree murder, so the evidence was sufficient to support the *1134 conviction of the lesser offense of manslaughter.
March, 458 So.2d at 309. The point was elaborated and its application to the broader societal issue presented by cases like this one was explained in a remarkable opinion of Maryland's highest court. In Alston v. State, 339 Md. 306, 662 A.2d 247 (1995), citing March, the court said:
The relevant frame of reference, however, is Alston's participation in the gun battle. Both the Alston group and the New York group were armed and prepared to do battle whenever and wherever their forces encountered one another. When their forces did meet at Pressman and Division Sts., they opened fire, returned fire, and continued to fire in mindless disregard of the lives of the people on the street and in the surrounding houses. Each participant, prior to the actual combat, was willing to use lethal force when the opposing groups met. Each participant manifested depraved heart malice toward noncombatants when the two groups met and sought to kill each other as they previously had determined to do. There would have been no mutual combat, and no murder of an innocent person, but for the willingness of both groups to turn an urban setting into a battleground. In this sense each participant is present, aiding and abetting each other participant, whether friend or foe, in the depraved conduct.
Alston, 339 Md.App. at 316-17, 662 A.2d at 251. A like decision is People v. Daniels, 172 Mich.App. 374, 431 N.W.2d 846 (1988), in which the following ruling of the trial judge sitting non-jury was affirmed:
`The trial court found that defendant was the driver of the blue car and that Gary Clark fired the shot that resulted in Berry's death, but that defendant and Gary Clark were equally culpable for holding their shoot-out on the residential street where it was likely that other people could be shot and killed. The trial court also found that the shoot-out was mutually agreed to by defendant and Gary Clark and that defendant, at a minimum, intended to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm was the probable result of his act. Although the court found this intent sufficient to make the killing murder in the second degree, the court entered a verdict of involuntary manslaughter because the court was not satisfied that the prosecution proved that the mitigating circumstance of provocation did not exist in light of the evidence of the beating defendant underwent and the shots fired during his first encounter with the Clarks.'
Daniels, 172 Mich.App. at 377-78, 431 N.W.2d at 848. Accord, e.g., People v. Aurelio, 167 Cal.App.3d 52, 212 Cal.Rptr. 868 (1985)(irrelevant whether defendant convicted of second degree murder actually fired weapon which killed companion because he was active accomplice in commission of provocative act of driving vehicle used to invade rival gang's territory in search of rival gang member); People v. Russell, 91 N.Y.2d 280, 693 N.E.2d 193, 670 N.Y.S.2d 166 (1998)(holding defendant criminally responsible for death although fatal bullet did not come from his gun when he aided and encouraged others by agreeing to engage in gun battle and placed life of innocent bystander at grave risk); see also People v. Gardner, 37 Cal. App.4th 473, 43 Cal.Rptr.2d 603 (1995); Commonwealth v. Moyer, 357 Pa. 181, 53 A.2d 736 (1947). We believe that the principles announced in these cases are sound and that they compel rejection of the claim that motions for dismissal of the crimes charged in counts I and II should have been granted. See also State v. Brady, 745 So.2d 954 (Fla.1999)(discussing doctrine *1135 of transferred intent); Provenzano v. State, 497 So.2d 1177 (Fla.1986), cert. denied, 481 U.S. 1024, 107 S.Ct. 1912, 95 L.Ed.2d 518 (1987).[6]

II.
We find, however, that the trial was reversibly infected as to all of the charges by error in admitting evidence concerning gang activity which was unrelated to the issues involved in the case. The testimony in question came in through Officer Milton Montes Deoca of the City of Miami Police Department. Over objection, as the appellant's brief accurately describes his testimony:
Montes-Deoca used broad strokes to paint a general, negative picture of gangs for the jury. He told the jury about Chicago style gangs: gangs that affiliate themselves with a nation and will have governing bylaws and standard operating procedures. The Latin Kings and the Second Street Fellows, Montes-Deoca proclaimed, were part of this gang network. He then narrowed his focus to the Latin Kings in particular. The officer explained that this gang was part of a nation or group called the People Nation. Montes-Deoca identified graffiti depicting a five-pointed crown, a pitch fork, the words, "Latin Kings," as symbols demarcating Latin King turf. Montes-Deoca painted the defendant into the general gang culture picture he created for the jury. He reviewed photographs of the defendant's haircut depicting a "III" indicated to the officer that the defendant belonged to the Latin Kings. The Latin Kings and the Second Street Fellows were rival gangs, declared the officer, because they fought over girls. He also defined the phrase, `almighty don't love nobody,' as a challenge meaning that the Latin Kings was a nation unto itself that would take anyone on.
We are compelled to hold that this evidence requires reversal. E.g., Garcia v. Konckier, 771 So.2d 550 (Fla. 3d DCA 2000); Doherty v. State, 726 So.2d 837 (Fla. 4th DCA 1999). It is true, as the state argues, that in some contexts, evidence of gang membership may be admissible to explain such disputed or unclear issues in the case as premeditation, motive or intent. See John C. Theuman, Annot., Admissibility of Evidence of Accused's Membership in Gang, 39 A.L.R.4th 775 (1985); Edward J. Imwinkelried et al., Courtroom Criminal Evidence § 907 (3d ed.1998). That rule, however, does not apply here. This is because at trial there was no genuine questioneven without Montes-Deoca's testimonyas to any of the actions or motivations of each of the players, including their gang membership. The testimony therefore about the evil of gangs in general and these in particular could only have served to lead the jury to base its verdict, not on Reyes's personal guilt, but on a feeling that his conviction would strike a blow against the dangers to the country presented by the existence of gang violence nationwide and those to the community posed by the Latin Kings and the Second Street Fellows. See Garcia, 771 So.2d at 550 (emphasis of wrongful death victim's status as gang member requires reversal in civil action); accord People *1136 v. Cardenas, 31 Cal.3d 897, 647 P.2d 569, 184 Cal.Rptr. 165 (1982); Fare v. Wing, 67 Cal.App.3d 69, 136 Cal.Rptr. 390 (1977)(general testimony on the background of gang culture and reputation held reversible error); People v. Sellan, 143 A.D.2d 690, 533 N.Y.S.2d 109 (1988), appeal denied, 73 N.Y.2d 860, 537 N.Y.S.2d 506, 534 N.E.2d 344 (1988); Galvez v. State, 962 S.W.2d 203 (Tex.Ct.App.1998); c.f. People v. Choe, 230 Ill.App.3d 438, 172 Ill.Dec. 36, 595 N.E.2d 99 (1992); Commonwealth v. Pagano, 47 Mass.App. 55, 710 N.E.2d 1034 (1999), review denied, 430 Mass. 1104, 714 N.E.2d 826 (1999), cert. denied, 528 U.S. 1089, 120 S.Ct. 820, 145 L.Ed.2d 690 (2000).
While we have carefully considered the possibility that this evidence was harmless, we cannot conscientiously so conclude. In the context of this case, in which the state's contentionthat the sole criminal responsibility for these horrific events lay with a person who did not directly harm the victims and, indeed, was the only participant who was himself injuredwas problematic and even counterintuitive, we cannot say that the overemphasis of the gang element in the case did not affect the verdict. Goodwin v. State, 751 So.2d 537 (Fla.1999); State v. DiGuilio, 491 So.2d 1129 (Fla.1986); Cooper v. State, 778 So.2d 542 (Fla. 3d DCA 2001); Ousley v. State, 763 So.2d 1256 (Fla. 3d DCA 2000).

III.
Treating Reyes's other points, we first consider his complaints about the trial court's actions in giving jury charges on the issues of Espinosa's self-defense[7] *1137 and the elements of aggravated battery,[8] each of which represented material departures from the standard jury instructions, and, in the latter case, the statutory elements of the offense. No more need be said about these rulings than that they were both reversibly incorrect, see Weiand v. State, 732 So.2d 1044 (Fla.1999)(self-defense); Smith v. State, 87 Fla. 502, 100 So. 738 (1924)(intent to cause injury element of offense); Neal v. State, 783 So.2d 1102 (Fla. 5th DCA 2001)(same), and cases cited; Viveros v. State, 699 So.2d 822 (Fla. 4th DCA 1997)(misinstruction as to element of offense reversible error); Perriman v. State, 731 So.2d 1243 (Fla.1999)(stressing importance of adhering to standard jury instructions), and that they must not be repeated at the new trial.[9]
Because we find no relevance to any material issue in the case, we also find error under the Williams Rule in the admission of testimony that on a prior occasion Reyes shot at another member of the Second Street Fellows gang.[10] See State v. Lee, 531 So.2d 133 (Fla.1988). The defendant's remaining points either have been mooted, present no error, or concern issues unlikely to recur at the new trial.

IV.
For the foregoing reasons, the convictions and sentences under review are reversed and the cause is remanded for a new trial to be conducted in accordance with the views expressed in this opinion and for such other further and necessary proceedings as may be consistent herewith.
Reversed and remanded.
NOTES
[1] For reasons known only to herself, the State Attorney did not also proceed against the actual shooter.
[2] The defendant does not claim any evidentiary or legal insufficiency in the convictions as to counts III and IV which involve Hugo Paniagua and Daniel Espinosa. See Taylor v. State, 444 So.2d 931 (Fla.1983)(recognizing crime of attempted voluntary manslaughter); Kauffman v. State, 729 So.2d 424 (Fla. 5th DCA 1999), review denied, 744 So.2d 454 (Fla.1999)(same).
[3] We are well aware that the state pursued a quite different theory of criminal responsibility in the trial court: that Reyes initiated a chain of events resulting in the Ramirezes' death and injuries, which, it contended, was unbroken by Espinosa's apparently independent acts in shooting the shotgun because, it argued, those acts were in lawful self-defense. Cf. Wright v. State, 363 So.2d 617 (Fla. 1st DCA 1978), cert. denied, 372 So.2d 471 (Fla. 1979); Parrish v. State, 97 So.2d 356 (Fla. 1st DCA 1957), cert. denied, 101 So.2d 817 (Fla. 1958). Cf. also Eversley v. State, 748 So.2d 963 (Fla.1999). We have been unable to discover any authority in the history of Anglo-American criminal jurisprudence which considers the possibility, let alone a case which holds, that an initial shooter like Reyes may be criminally responsible for the death of a bystander arising out of a counter-attack such as Espinosa's. (Compare, e.g., Mikenas v. State, 367 So.2d 606 (Fla.1978)(holding defendant guilty of felony murder for the killing of his accomplice by a robbery victim acting in self-defense); State v. Baker, 607 S.W.2d 153 (Mo.1980)(same). The felony murder doctrine was not available to the state here because Reyes's "initial" offense, aggravated assault, is not one of the offenses specified in section 782.04(3) and because there is no such thing as "felony aggravated battery.")

What is more, the state's contention that Espinosa acted or, really, re acted in lawful self-defense runs directly afoul of the actual facts of the case that, instead of retreating to safety, Espinosa stayed at the scene, and after Reyes had stopped shooting, repeatedly fired the shotgun without aiming it into a public parka scenario which would mean that, far from acting in justified self-defense, Espinosa was simply taking part in a gun battle with the opposing gang and thus committed obviously "intervening" offenses of his own. See Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 3.12, at 402 n. 53 (1986):
Of course, the situation may be such that A ought not to shoot at B in self-defense, etc., because of the presence of bystanders like C whom A might hit instead. If there is a high degree of risk to people like C involved in A's shooting at B, A's killing of C will amount to manslaughter, Henwood v. People, 54 Colo. 188, 129 P. 1010 (1913); Annot., 18 A.L.R. 917, 928 (1922); if a substantial certainty, to murder.
For all these reasons, although the alternative rationale we adopt makes it unnecessary to directly so hold, it is almost impossible to conceive that the Ramirez convictions could be upheld on the prosecution's theory. See Hodges v. State, 661 So.2d 107 (Fla. 3d DCA 1995), review denied, 670 So.2d 940 (Fla. 1996); Rivers v. Commonwealth, 21 Va.App. 416, 464 S.E.2d 549 (1995); State v. Garner, 238 La. 563, 115 So.2d 855 (1959); Wayne R. LaFave, supra, § 3.12. See also Velazquez v. State, 561 So.2d 347 (Fla. 3d DCA 1990), cause dismissed, 569 So.2d 1280 (Fla.1990), review denied, 570 So.2d 1306 (Fla.1990).
[4] That we hereafter order a new trial on other grounds makes it also unnecessary to determine whether one would be required simply because the first trial was conducted on different, almost certainly wrong legal underpinnings.
[5] Unlike our case, however, all of those involved were charged with second degree murder.
[6] With respect to the aggravated battery conviction, we note that unlike some jurisdictions, see Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 3.12, at 400 n. 46 (1986), the Florida battery and aggravated battery statutes proscribe only the striking of "another person," §§ 784.03, 784.045, Fla. Stat. (2001), rather than a particular victim. Thus, as the court in Medina v. People, 133 Colo. 67, 291 P.2d 1061 (1956) specifically held in interpreting an identically worded statute, there is no statutory impediment to finding Reyes guilty of the aggravated battery of Evangelina Ramirez, even though he may have intended only to hit Daniel Espinosa, Hugo Paniagua, or both.
[7] The court agreed to adopt a special jury instruction proposed by the state which reflected its theory of causation:

A person who by actual assault or threat of violence causes another person to do an act resulting in physical or corporal injury causing another person's death or injury is criminally responsible for the death or injury.
Before you can find Cesar Alexander Reyes criminally responsible for the death of Bernabe Ramirez and the injury to Evangelina Ramirez, the State must prove the following four elements beyond a reasonable doubt:
1. The act or acts done by Irse Daniel Espinosa to avoid the danger brought about and caused by Cesar Alexander Reyes were such as a reasonable person would have taken under the circumstances, although it need not appear that there was no other way of avoiding the danger or escaping therefrom.
2. The apprehension on the part of Irse Daniel Espinosa was of immediate danger of suffering death or great bodily harm.
3. The apprehension on the part of Irse Daniel Espinosa of suffering death or great bodily harm was reasonable and well-grounded.
4. The injuries received by Bernabe Ramirez which produced death and the injuries received by Evangelina Ramirez were the natural and probable consequences of the acts of Cesar Alexander Reyes.
In such cases Cesar Alexander Reyes' responsibility or justification for the death of Bernabe Ramirez and injury to Evangelina Ramirez is measured and determined by what would have been the case had Cesar Alexander Reyes killed Irse Daniel Espinosa at the time and place and under the circumstances of the original assault or threat of violence.
The emphasized portion of this instruction erroneously departs both from the standard self-defense jury instruction, see Fla. Std. Jury Instr. 3.04(d), and more importantly, from the applicable law, which permits the deadly use of force in self-defense only when the person has used every reasonable means to avoid danger including retreat. Weiand v. State, 732 So.2d 1044 (Fla.1999). (Because of the centrality to the state's case of a finding that Espinosa acted in justified self-defense, we are unable to agree with the not unreasonable argument, based on Wright, 363 So.2d at 618-19, that the precise dimensions of the self-defense doctrine do not apply when, as here, the pertinent issue is not justification, but causation.) While the wording of the charge did accommodate the state's case by avoiding the obstacle presented by the law to the actual facts of Espinosa's conduct, see supra note 3, the furtherance of either side's chance of success is hardly a basis for a modification of the law.
[8] On this issue both the standard jury instruction and the definition of aggravated battery were "amended" to require only that the defendant have committed "an intentional act that caused great bodily harm to Evangelina Ramirez" instead of the far different requirement in section 784.045(1)(a)1, that he "intentionally... cause[d the] harm."

As with the self-defense instruction, the redefinition of the crime was successfully requested by the state simply because it was impossible to establish, as it thought it had to, that Reyes specifically intended to harm Ms. Ramirez. Without reemphasizing the impropriety of accommodating the elements of a crime to fit the state's case, we have already pointed out that, under the statute, the intent in question need only be directed to "another person" and not just the eventual victim. See supra note 6. Thus, Reyes's intent to harm Hugo Paniagua or Daniel Espinosa would satisfy the element of the crime prescribed by law.
[9] In light of our obvious disapproval of the "uninterrupted-chain-of-events" theory upon which the case was tried below, see supra note 3, and the alternative theory of which we have approved and upon which the case will presumably be tried the second time, it may well be that no self-defense instruction at all will be appropriate.
[10] Although this evidence was admitted to demonstrate why the Second Street gang members felt it necessary to arm themselves prior to the confrontation in the park, this matter was irrelevant to any of the issues before the jury concerning Reyes's guilt in the incident. Lee.