# Commonwealth v. Almeida

*Ephraim Lipschutz*, assistant district attorney, for Commonwealth.

*Arlin M. Adams* and *Thomas J. Minnick, Jr.*, for defendant.

CARROLL, J., December 10, 1948.—In this case, defendant David Almeida was indicted for having caused the death of Cecil Ingling, a police officer of the City of Philadelphia, on January 30, 1947, opposite an Acme Market located at 1934 Fairmount Avenue in the City of Philadelphia, immediately following a robbery which he and his codefendants, James Francis Smith and Edward Hough, jointly indicted with him, had just effected in this store. After firing several shots, one of which killed Patrolman Ingling, the three were pursued by police and Edward Hough was apprehended after he had fallen or had been pushed out of the car. The other two escaped. Shortly thereafter Hough pleaded guilty and after hearing the evidence affecting him the court made a finding of murder in the first degree and fixed the penalty of death.

Smith and Almeida having made their escape, went south, participated in a holdup of a bank in New Orleans and were subsequently arrested in the Middle West. They were tried in United States district court in Louisiana for the bank holdup and sentenced to long terms in a Federal penitentiary. They were then returned to Philadelphia in custody of the United States marshal as Federal prisoners to stand trial on this bill. The fact of their apprehension, trial and sentence and their being in the custody of the United States marshal was carefully kept from the jury in this case. There was no evidence of any of the previous record of Almeida before the jury for its consideration in the matter of fixing the penalty.

The evidence for the Commonwealth consisted of the testimony of 31 persons, some of whom were eye witnesses who identified defendant as having been present, while defendant offered but one witness whose testimony was limited to an expression she heard given by someone immediately after the shooting. Defendant pleaded not guilty and did not take the witness

stand. The jury found a verdict of murder in the first degree and fixed the penalty at death. Codefendant Hough, his wife, and an uncle, Edward Mooney, testified against defendant, the two latter to the association of the three men on the day of the robbery. The facts of the case are as follows:

Sometime before noon on the morning of the robbery Almeida went to Hough's home at 5101 Arch Street in West Philadelphia, arriving in a taxicab. He was well-known to the Hough family, having been acquainted with Hough for many years prior to the events of this case. He remained there about 15 minutes and asked Hough to accompany him, which Hough did. They took the cab, which had remained outside, and went to Kenney's taproom in Northwest Philadelphia. En route Almeida told Hough that he had no money and Hough paid the fare. They were known in this taproom which was in the vicinity of the home of James Smith and their presence together was testified to by the bartender and the proprietor. While they were there Smith joined them, left for about 15 minutes, returned for a short time and left again. He then returned and all three took a trolley car to the central part of Philadelphia where Hough drew $90 from the Philadelphia Saving Fund Society and gave Smith and Almeida $10 each. During all this time they had several drinks of whiskey in various taprooms en route. They then went to the home of a cousin of Almeida in the neighborhood of Twenty-fourth and Spruce Streets and from there to a taproom near Twenty-second and Fitzwater Streets where Joseph Almeida, a brother of defendant, was employed. In what has been described as a cubicle in this taproom Smith distributed a .45 automatic Army type revolver to Hough, a large pistol to Almeida, which Hough said looked like a horse pistol, and exhibited a smaller one which he retained himself. At the trial Hough iden-

tified the pistol he had used, which was recovered by the police immediately following his arrest. A .22 calibre revolver, fully loaded, recovered in the abandoned car about two hours after the arrest, was in evidence. The pistol alleged to have been in the hands of Almeida was not recovered.

They proceeded from the taproom at Twenty-second and Fitzwater Streets to the vicinity of Fifty-first Street and Haverford Avenue, in West Philadelphia, and the suggestion came from one of them that a car be obtained from some garage. Hough then suggested a garage on 673 North Forty-first Street, just off Haverford Avenue, to which all three men repaired. According to Otis Oliver, who was in charge of this garage, the three, wearing black glasses, entered sometime between 4:30 and 5:00 o'clock. All three drew revolvers and Hough ordered the witness to face the wall and, according to the witness, Hough hit him with the pistol, but according to Hough, Almeida slapped him. The witness was commanded to produce keys for the cars that were in the garage and then after a survey of all the cars in the garage they decided to take a car described throughout the testimony as a blue car, ordered the witness to start the motor, turn on the lights, stop the motor and turn off the lights, which he did. They left the garage in this car with Smith at the wheel. The car was the property of the City of Philadelphia and had a faded inscription of the city's ownership on both side doors.

They then proceeded from this point over the Spring Garden Street Bridge to the vicinity of Twentieth Street and Fairmount Avenue. At this point Smith said: "This looks like a good place", whereupon he parked the car at an angle against the curb in front of 1934 Fairmount Avenue, the Acme Market. Almeida and Hough left the car and Smith remained at the wheel. Before entering the store those two stood

in full view before a window and were observed and identified by one of the cashiers in the store and by the wife and son and daughter of Patrolman Ingling, whose car was parked along the curb opposite the door. Previously Ingling had done his shopping in the store and had gone down the street to pay a bill at a service station. Outside the store Hough was observed to put on a pair of black glasses and Almeida to tie a handkerchief around the lower part of his face. They then entered the store with drawn guns. Hough immediately went to one of the cash registers and emptied it, telling the girl it was a holdup. He took all the money and the cashier's wallet which contained $3, stuffed all of it into his pocket and went to the other register and took all the money there. Meanwhile, Almeida stood at a point in the Acme Market, according to the manager, who, sensing something was wrong because of a sudden stillness, turned around and looked into a gun in Almeida's hands. He yelled holdup and grabbed two cans of corn, whereupon Almeida shouted: "I'll get you, you son of a bitch", and started firing. This witness testified Almeida's gun looked like a long gun and that it seemed to have a longer muzzle than the gun which was in court and identified by Hough as his gun. Almeida fired at least one shot either at the manager or over his head in the ceiling and as he left the store fired another shot. Altogether, $259 was taken from the Acme Market, $3 from the cashier, and Almeida grabbed some bills from a one-armed man whom he cursed and who was leaving the store in the path of Hough and Almeida.

They immediately repaired to the automobile, which Smith was backing out of position against the curb. Patrolman Ingling returned to his car about this time and the cries of holdup brought three policemen in two police cars to the scene. These officers heard the firing but were not certain of what was happening. When

Officer Waters and Officer Fox, who were in one of the police cars, with Waters driving, came almost abreast of the blue car which was backing out, Hough fired a shot in their direction at a distance of about 30 feet, whereupon Waters fired a shot at him. At that time Ingling had already been shot and his body was on the pavement though the officer, who was acquainted with Ingling, did not know who he was. Officer Fox left the car, went down on his knee behind Ingling's car and started firing.

Hough testified that the door of the blue car caught in Ingling's car and was forced back and sprung and that he had to climb over Ingling's fender to get into the blue car into which Almeida had preceded. He said he was in a crouched position and Almeida's arm was over his body and while in this position Almeida fired the shot, which penetrated the brain of Officer Ingling, who apparently was making an effort to grab Hough or who had already grabbed Hough as he dove into the car. The bullet entered the right side of Ingling's head, above his right ear, near the edge of the frontal and parietal bone and went through his brain, destroying it, passed out above the left eye and was not recovered. Mrs. Ingling testified very emphatically, and her son and daughter likewise testified, that the shot was fired by Smith but the three Inglings also stated that Almeida was in the driver's seat. All the officers who gave pursuit and the eye witnesses at the scene, as well as Hough, testified that Almeida was in the center position on the front seat and that Smith was at the wheel.

The cross-examination by the defense was directed to show that it was a police officer's bullet that had killed Ingling but it was never clearly established from which gun the fatal bullet was fired, although the preponderance of evidence on this point was that Ingling had been shot before the police opened fire

and from the position of the various police officers while they were firing and Ingling's body at the side of the stolen car it appeared affirmatively that Ingling was never in the line of fire of any of the police officers' revolvers.

After the blue car containing the three defendants got away from the curb it was pursued by the two red cars and one of the men in the blue car fired back at the pursuing cars. After a chase of some blocks Hough either fell or was pushed out of the car and was captured by Patrolman Fox. While Hough was in this custody but before being taken to the police station an unidentified colored man came up and handed Patrolman Fox the .45 calibre Army automatic which Hough identified the next day and at this trial as the pistol he had. It had unusual identifying characteristics, being two special white-colored grips with brown streaks and varying greatly from the standard grips usually found on this type of gun.

Officer Waters continued the pursuit of the blue car and lost it. It was recovered about 7:15 p.m. in front of 2714 West Somerset Street, the motor still running, by Sergeant Kronberger and Officer Kauffman. This place is in the vicinity of Smith's home and Kenney's taproom. At the time of its recovery the .22 calibre revolver, fully loaded, and a pair of black glasses, were found on the driver's seat.

The theory upon which the Commonwealth tried this case was that it was a killing in the perpetration of a robbery. The theory of the defense, gathered mainly from its cross-examination, was that the fatal shot was fired by one of the police officers and, therefore, the responsibility for it could not be attributed to defendant. In his address to the jury, defendant's counsel referred only briefly to the facts of the case, and among other things stated that he "never contended he (Almeida) was not in the holdup", and as

to stealing the car, he said "we do not contend that". He also made the following statement: "As to the fact of the holdup we have no complaint".

Inasmuch as defendant's plea of "not guilty" had not been changed, it appeared to the court that these statements could be construed to amount to a waiver of defendant's constitutional and other rights, his plea of "not guilty" being a general traverse and denial of all the charges, and, therefore, the court charged at length that irrespective of such statements by defendant's counsel, defendant remained innocent until the jury found him guilty of all charges beyond a reasonable doubt.

Another theory advanced by defendant and urged upon the jury was that defendant was not in full possession of his senses due to the fact that he had been drinking. However, he offered no evidence on the point of intoxication and relied entirely upon his own expressions to the jury, some of which were as follows: "Did Almeida have full use of his senses?" "Drinking does mitigate the circumstances and the punishment". The trial court being of opinion that these statements and the testimony of drinking, though coming only from the Commonwealth's witnesses, might be construed to raise the question of intoxication as a defense, included in its charge the law relating to that subject. While no error has been assigned to that portion of the charge we have examined it carefully and find that it discloses no error.

In proper time following the verdict a motion for new trial was filed on the basis of alleged errors in the charge, viz., the failure of the Commonwealth to call certain witnesses and to produce certain evidence and in the manner whereby two members of the jury were peremptorily challenged after having previously been accepted and sworn. We have had the benefit of oral argument and written briefs on all the points

thus raised and have given them the careful consideration which our duty commands and our conscience dictates. After the fullest deliberation a majority of the court has come to the conclusion that the reasons advanced are insufficient for us to set aside the jury's verdict and accordingly defendant's motion must be denied.

It should be noted at the outset that this defendant did not at the trial, nor does he now, raise any real dispute as to his wilful and deliberate participation and complicity in the series of violent events that ultimately led, as one could have readily foreseen, to the death of Cecil Ingling. He does, it is true, by a nimble exercise of ingenuity in the drawing of inferences from the record, seek to show that the fatal bullet came from a policeman's gun and not from a weapon in the hands of himself or one of his confederates.

On the basis of this supposition defendant asserts that he cannot have been guilty of first degree murder and that therefore the trial judge erred in his charge and in refusing the defendant's thirteenth point for charge, as follows:

"If you find that the bullet which was fired and killed the deceased was not fired by any of the three (3) men charged with perpetrating the robbery in question, you cannot convict the defendant of murder in the first degree."

Whatever doubts may have existed on this question have been unequivocally settled by the recent decision in Commonwealth v. Moyer, 357 Pa. 181 (1947), which stands for the proposition that all who participate in a robbery are guilty of first degree murder if someone is killed in the course of the crime even though the fatal bullet is fired by some third person "in an attempt by him to frustrate the attempted robbery". The Moyer case thus squarely rules one of the two chief points raised by defendant in support of his motion.

The remaining question which merits discussion may not be answered so shortly as there is no directly controlling authority but nevertheless we are of opinion that the law is adverse to defendant's contention. Is it error to permit a juror to be challenged peremptorily after 12 have been accepted and sworn but before the two alternates authorized by the Act of May 1, 1935, P. L. 127, 17 PS §1153, have been selected and before the case has been opened to the jury? This is the issue to be decided. The pertinent facts are these: After 12 jurors had been chosen and individually sworn, a recess was taken. It then developed that juror no. 5 was properly objectionable to the Commonwealth because of certain facts not known when she was selected but which would have been sufficient for the trial judge in his discretion to discharge her on his own motion even after she was sworn: compare Commonwealth v. Curry, 287 Pa. 553 (1926), and see Commonwealth v. Marion, 232 Pa. 413 (1911); 50 C. J. S. 1007. At a conference in chambers this matter was discussed by the trial judge, the district attorney and the defense counsel and, far from objecting to the district attorney's challenging juror no. 5, defense counsel actually reserved the right to exercise a similar peremptory challenge despite the fact that 12 jurors had then been sworn. Thereafter, juror no. 5 was challenged in open court by the district attorney, the reason not being stated on the record to save the juror embarrassment. The remaining jurors were then moved up and another prospective juror was called, examined and challenged for cause. It was at this juncture that the defense challenged juror no. 11, who had formerly been no. 12, which challenge was allowed. The selection of the remaining members of the panel, including two alternates, was thereafter completed without incident and

the case was then opened to the jury without any objection by the defense.

Having been convicted and feeling himself aggrieved principally by the imposition of the death sentence, defendant now for the first time argues that the discharge of juror no. 5 violates article I, sec. 6, and article I, sec. 10 of the Constitution of Pennsylvania, the Act of May 1, 1935, P. L. 127, 17 PS §1153, and the Act of March 6, 1901, P. L. 16, as amended by the Act of July 9, 1901, P. L. 629.

We have no hesitation in holding that defendant actually consented to the procedure of allowing the peremptory challenge to juror no. 5 and that he cannot now raise as error what is quite plainly an afterthought. Furthermore, his contention concerning double jeopardy, if valid at all, had to be raised by way of special plea at the trial of which he now complains: Commonwealth ex rel. v. Richards, 274 Pa. 467. The fact that this was not done further demonstrates that defendant acquiesced fully in the procedure followed at the trial but that now, disappointed with the outcome thereof, pursues a last desperate remedy. Our views on this aspect of the argument are set forth fully in the separate opinion filed by our brother, MacNeille, P. J., in which we join.

Although the problem is not entirely free from difficulty we think that defendant's position is without foundation for an additional reason. We are of opinion that, in a case in which there are to be 14 jurors selected under the authority of the Act of 1935 an accused is not in jeopardy until all 14 are sworn and, until that time, any one of the jurors previously accepted and sworn may be challenged within the reasonable discretion of the trial judge.

The concept of jeopardy is a highly technical one, the origins of which are to be found in the days when an accused was subject to trial by combat: Common-

wealth v. Simpson, 310 Pa. 382 (1933). The Simpson case illustrates, however, that it is not without adaptability to the requirements of modern jurisprudence. Jeopardy is, of course, the peril in which a defendant is put upon his trial: Commonwealth v. Fitzpatrick et al., 121 Pa. 109, 116 (1888). But what is the precise moment when this peril begins? Is there magic in one moment rather than another?

The cases seem to speak generally in terms of the moment when the jury is charged with the prisoner (Peiffer v. Commonwealth, 15 Pa. 468 (1850); McFadden v. Commonwealth, 23 Pa. 12 (1853); Alexander v. Commonwealth, 105 Pa. 1 (1884); Hilands v. Commonwealth, 111 Pa. 1 (1885); Commonwealth v. Curry, 287 Pa. 553 (1926)), and this in turn is interpreted as being the moment when the "*full* jury is impanelled and *all* the jurors are sworn:" (italics supplied): McFadden v. Commonwealth, supra; Alexander v. Commonwealth, supra; Commonwealth v. Curry, supra. Having in mind the provisions of the Act of 1935, it is our view that this moment must now be held to be when the last alternate juror is sworn. This appears from the provisions of the act itself giving each side a peremptory challenge in addition to those it already possesses. It cannot be doubted then that the act contemplates the exercise of challenges after 12 jurors have been chosen and until the last of 14 has been sworn. It is equally clear that the full jury in such a case is not impanelled until that point.

Some of the earlier cases indicate that a defendant is in jeopardy when the twelfth juror has been sworn (Hilands v. Commonwealth, supra; Commonwealth v. Curry, supra), but this is because they were decided before the Act of 1935. The essential question remains, that asked almost 100 years ago in McFadden v. Commonwealth, supra: "At what point is an accused called to stand upon his defense? Certainly not until the

Commonwealth is ready to begin the assault." The obvious answer must be that assault begins when the matter of the jury is completed, and in a present day murder case, in which habitually alternate jurors are selected, that is when the fourteenth juror has been sworn.

We think that a contrary result would be a reliance upon the shadow of technicality rather than the substance of the law to which even a most jealous regard of defendant's right does not lead us. And even if we were to consider our conclusion a change from the earlier decisions we do not conceive it as a violation of the constitutional mandate that "Trial by Jury shall be as heretofore and the right thereto remain inviolate." As was said in Commonwealth v. Fugmann, 330 Pa. 4, 28, 29 (1938), which upholds the constitutionality of the Act of 1935:

"It is well settled that the word 'inviolate' as used in the constitutional provision quoted means freedom from substantial impairment. It does not import rigidity of regulation in the manner of impanelling a jury. The cardinal principle is that the essential features of trial by jury as known at the common law shall be preserved. The fundamental law preserves the substance of the right; details of administration which leave the enjoyment of the right unaffected are of no constitutional concern."

The language used in the Federal and various State constitutions to delineate and protect our system of trial by jury may vary but the basic attributes, the preservation of which is necessary to keep the right "inviolate", are, in the last analysis, simply number, impartiality and unanimity. So long as these three essential features are maintained in all their ancient force and effect, details of the procedure adopted in the trial court in selecting the jury are not violative of the constitutional mandate: Commonwealth v.

Fugmann, supra; and see Commonwealth v. Exler, 61 Pa. Superior Ct. 423, 436 (1915) ; Commonwealth v. Deysher, 139 Pa. Superior Ct. 497, 501 (1940) ; People v. Peete, 54 Cal. App. 333, 364, 202 Pac. 51, 65 (1921) ; Lommen v. Minneapolis Gaslight Co., 65 Minn. 196, 68 N. W. 53 (1896).

In the case before us no right guaranteed to defendant was violated and the record discloses nothing that can be construed as a derogation of defendant's right to trial by jury. On the contrary, the accused was accorded everything guaranteed to him by the Constitution: a trial conducted in conformity with recognized forms of law before a jury of 12 citizens who were capable of deciding his case impartially and unanimously: People v. Cosmo, 205 N. Y. 91, 103, 104, 98 N. E. 408, 411 (1912) ; People v. Mitchell, 266 N. Y. 15, 19 (1934), 193 N. E. 445, 446 (1934).

We are aware that in some instances the violation of a constitutional guaranty is not dependent upon the amount of prejudice suffered by an accused but it is pertinent to point out that defendant here was in no way prejudiced by the procedure followed at the trial. He took full part in the choice of the jury and all 14 were acceptable to him, for in fact he had not exhausted all his peremptory challenges when the jury was at last sworn. At no time did he express any objection to or disagreement with what occurred. Moreover, all of this happened before a single word of testimony or a single piece of evidence of any kind was introduced at the trial.

The preservation of constitutional principles is not aided by stultifying technicalities. We believe it would fly in the face of reality to hold that the slight variation that occurred under the circumstances of this case in the administrative detail of choosing the jury deprived this defendant of any of the basic elements comprising his right to a trial by jury. He had a full

and fair trial in which his defense was conducted by able counsel. He has been tried and convicted in accordance with law and we find no reason for granting a new trial.

## Concurring Opinion

MACNEILLE, P. J., December 10, 1948.—In the current case defendant David Almeida was indicted for having caused the death of Cecil Ingling, a police officer of the City of Philadelphia. At the trial defendant pleaded not guilty and did not take the witness stand. The jury found a verdict of murder in the first degree and fixed the penalty at death. Defendant has filed a motion for a new trial, which we are now considering.

Defendant has filed some 13 reasons for a new trial. Each has been carefully considered and has been found to be without merit. In this separate opinion we deem it necessary to discuss only defendant's reasons numbers 5 and 7 for a new trial. Reason number 7 reads as follows:

"7. The learned trial judge erred in permitting the district attorney to peremptorily challenge juror no. 5, Miss Betty Guinn, after she had been accepted and sworn and allowed to be seated in the jury box and after seven other jurors had also been accepted, sworn and seated in the jury box. . . .

" 'Mr. Lipschutz: Mrs. Guinn, are you no. 5? If your honor please, the Commonwealth desires at this time to exercise a peremptory challenge, and challenges no. 5, Mrs. Betty Guinn.' "

The situation giving rise to this alleged error of the trial judge arose after the first 12 jurors had been selected and individually sworn. During a recess after the 12 jurors had been sworn, it came to the attention of the trial judge that Mrs. Guinn, juror no. 5, was

not a desirable juror for this case. In order not to embarrass the juror, the reasons for allowing the peremptory challenge were not placed on the record. However, defendant's counsel, the district attorney and the trial judge conferred in chambers and it was agreed that the district attorney might exercise his challenge. Defendant's counsel at that time also specifically reserved the right to exercise any similar challenge, even though the 12 jurors had been sworn. After the court allowed the challenge, the following took place:

"Mr. Minnick: Well, of course, it is unusual—

"The Court. It is unusual.

"Mr. Minnick: Of course, if your honor says it is right, it is right or you would not allow it to be done.

"The Court: It is permissible.

"Mr. Minnick: I never saw it done.

"The Court: It has been done by defense attorneys, and I will give you the cases.

"Mr. Minnick: No; you are the law as far as I am concerned.

"The Court: Move up the jurors."

As a result of the court's ruling, the jurors were all moved up one. Defendant at no time made any objection or took any exception to this procedure. Defendant not only took no exception to this procedure but his counsel requested a peremptory challenge of juror no. 12, who became juror no. 11 after Mrs. Guinn, juror no. 5, was challenged. This challenge was allowed by the court.

We are of the opinion that when the first 12 jurors were selected and sworn and the jury cast their eyes upon defendant that he was placed in jeopardy. See Peiffer v. The Commonwealth, 15 Pa. 468; Hilands v. The Commonwealth, 111 Pa. 1; Commonwealth v. Curry, 287 Pa. 553. In Peiffer v. Commonwealth, supra, the court stated at page 470:

"The attorney-general has argued that there was in fact no departure, because the jury were not allowed to separate after the clerk had gone through the formality of stating to them the substance of the indictment, the plea, the issue, the submission of the prisoner to them for trial, and the nature of their function. But his statement is only an announcement of what has been done. A juror is charged with a prisoner as soon as he has looked upon him and taken the oath; for he cannot be withdrawn. The trial has commenced, and the prisoner stands before him as one of his judges."

Having been placed in jeopardy, the trial must proceed until it ends in a conviction or an acquittal, and in a capital case the court has no power to discharge a jury or allow a peremptory challenge of one of the jurors without the consent or acquiescence of defendant, unless an absolute necessity requires it. See Commonwealth v. Fitzpatrick, 121 Pa. 109; Commonwealth v. Simpson, 310 Pa. 380. Admittedly there is nothing on the record revealing an absolute necessity for allowing a challenge and discharge of Mrs. Guinn, juror no. 5. We therefore must only decide whether defendant consented or acquiesced in the discharge of Mrs. Guinn. We believe defendant did. The trial judge states defendant's counsel agreed to Mrs. Guinn's challenge in chambers and specifically reserved the right to make similar challenges. The record reveals that defendant's counsel in the presence of defendant acquiesced with the trial judge's ruling allowing the peremptory challenge and no objection was made or exception taken. To further show defendant's consent and acquiescence in allowing a peremptory challenge of Mrs. Guinn is defendant's own action in requesting his counsel to ask for a peremptory challenge of juror no. 12 after he had been selected and sworn. The record is convincing that defendant consented or acquiesced to the procedure in allowing the peremptory challenge of

juror no. 5 after the first 12 jurors were sworn and for that reason there has been no denial of any of the rights of defendant. See Commonwealth v. Fitzpatrick, 121 Pa. 109, supra; Commonwealth v. Simpson, 310 Pa. 380, supra.

Defendant further contends that he was placed in double jeopardy in being subjected to trial and conviction. The plea of double jeopardy is a special plea and must be raised at the time of the trial. The plea of former jeopardy may be made either in its common-law form or under the Criminal Procedure Act of March 31, 1860, P. L. 427, sec. 30, 19 PS §464. See Commonwealth v. Beiderman, 109 Pa. Superior Ct. 70. The burden of proving the double jeopardy is on defendant. See Commonwealth v. Brown, 28 Pa. Superior Ct. 296; Commonwealth v. Greevy, 271 Pa. 95; Commonwealth v. Duerr, 158 Pa. Superior Ct. 484. In Commonwealth ex rel. v. Richards, 274 Pa. 467, the court, in finding that a defense of double jeopardy must be raised by special plea at the trial, stated at pages 468, 469:

"The relator was regularly indicted, and is held in custody under a proper commitment; his claim of former jeopardy rests on questions of fact, and the customary way of raising the objection now called to our attention is by formal plea: 'The defenses of former jeopardy or of former acquittal or conviction, do not entitle the prisoner to be discharged on habeas corpus': 21 Cyc. 305, and many authorities cited. 'All questions which may arise in the ordinary course of a criminal prosecution are to be determined by the court to whose jurisdiction the defendant has been subjected by the law, and the fact that a defendant has a good and sufficient defense to a criminal charge on which he is held will not entitle him to his discharge on habeas corpus . . .; (so) the rule, supported by a majority of the decisions, is that the writ of habeas

corpus cannot be resorted to for the purpose of discharging a petitioner on the ground of former jeopardy,—such plea must be presented and tried in the court having jurisdiction to try the offender . . . and, if the decision of such court is thought erroneous, his remedy is by writ of error or appeal, not by habeas corpus'; 12 R. C. L. 1206."

However, the plea not having been made at the time of the trial, and the proof not having been presented, it is now too late to complain that defendant was placed in double jeopardy.

"Defendant assigns as his fifth reason for a new trial, that the learned trial judge erred in refusing to instruct the jury as requested by counsel for defendant as follows: . . . '13. If you find that the bullet which was fired and killed the deceased was not fired by any of the three men charged with perpetrating the robbery in question, you cannot convict the defendant of murder in the first degree.' "

This alleged error by the trial judge has been disposed of in the separate opinion filed by our brother, Judge Carroll, and we are in accord with that disposition. It is clear that the question is ruled by Commonwealth v. Moyer, 357 Pa. 181.

For all of the above reasons I would deny defendant's motion for a new trial.

### Dissenting Opinion

GORDON, P. J., March 28, 1949.—While I am in accord with the conclusion of the majority of the court with respect to all, except two, of the reasons assigned for a new trial in this case, I am compelled to dissent partially as to one of their conclusions and entirely as to the other. With respect to the first of them, I concur in the majority's final conclusion, but cannot agree with the reasoning by which it was reached;

and as to the other, I am in complete disagreement with both the reasoning of the majority and the conclusion reached by them. The first of these questions relates to the method of drawing the jury in the case, and the second to that part of the charge of the learned trial judge in which he instructed the jury, in effect, that, under the law of Pennsylvania, it makes no difference whether Officer Ingling, the deceased was, on the one hand, killed by defendant or one of his confederates in their flight from the scene of the robbery, or, on the other hand, by a bullet fired by one of the deceased's fellow officers who were attempting to apprehend defendant and his companions.

With respect to the first of these questions, namely, the method of drawing the jury, I cannot agree with the majority of the court that the Act of 1935, which authorizes the drawing of two alternate jurors, has the effect of establishing a jury of 14, rather than one of 12, for the trial of criminal cases. If it does, it would be clearly a violation of article I, sec. 6 of our Constitution, which provides that "trial by jury shall be as heretofore, and the right thereof shall remain inviolate". Under that section, the legislature could no more set up a jury of 14, or of any number other than 12, for the trial of criminal cases. The conception of a jury consisting of neither more nor less than 12, as it existed at the time of the adoption of the Constitution, is one of the fundamental characteristics of the common-law jury, and cannot constitutionally be changed by legislative enactment. On the other hand, it is well settled, both in this State, and by the overwhelming weight of judicial authority in other jurisdictions, that the constitutional guarantee of trial by jury was not intended to freeze the machinery by which a common-law jury is secured, and that the legislature is at liberty to vary, in response to changing

social conditions, the method and manner of securing such a jury, so long as the substantial rights of an accused to it are secured to him. Thus in Commonwealth v. Fugmann, 330 Pa. 4, in which our alternate juror law was under consideration, our Supreme Court said:

"It is well settled that the word 'inviolate' as used in the Constitutional provision quoted means freedom from *substantial* impairment. It does not import rigidity of regulation in the manner of impanelling a jury."

With these principles in mind, it seems clear that defendant was not denied any of the fundamental rights of a jury trial guaranteed to him by the Constitution. It is not contended that the substitution of the first two alternates to take the place of the two on the original jury that he and the Commonwealth had challenged, however belatedly, resulted in putting into the jury box to try him anyone unacceptable to defendant or disqualified by bias, interest, or otherwise. Both of those jurors were acceptable as alternates; and, at whatever time in the course of the trial they may have been substituted, in the exercise of the trial judge's discretion, defendant could not have objected to the substitution. The substitution here occurred at the beginning of the trial, before any evidence was heard, instead of at a later stage, and that fact in itself negatives any logical reason for objection by defendant, at least unless it clearly appears, as it does not here, that he was prejudiced by the action of the trial judge when the challenges were allowed. The final jury that tried him was still in the process of selection, and until it was selected, I believe the court acted well within the discretion vested in it by the Act of March 6, 1901, as amended by the Act of July 9, 1901, P. L. 629: Commonwealth v. Curry, 287 Pa. 553.

In addition, conceding that defendant might have objected and protected himself by an exception, I think

whatever constitutional right he might have asserted in this connection is one which a defendant may waive either expressly or by necessary implication. When, therefore, instead of taking a definite stand by exception and objection, he tacitly acquiesced in and accepted the court's ruling without question, he must be taken to have waived the objection he might have made. This prevents him from now taking advantage of his belated complaint that a right which he might have asserted, but did not, was denied him. This is especially so as he has wholly failed to show that he suffered any real injury from the court's action. In addition, when defendant added to the disruption of the original jury by himself challenging, immediately after the court ruled, another of the original 12 jurors, thereby bringing into the original group of 12, the second or fourteenth juror accepted, he completely abandoned the objection that he might perhaps have insisted upon, and joined in the action of the court which he now asks us to disapprove. In these circumstances he concurred in the substitution of both the alternates at the very beginning of the case as a part of the jury to try him, and will not be heard to complain that unacceptable jurors were thus wrongfully forced upon him. A different question arose, when the trial judge proceeded to call two more jurors as additional alternates after the thirteenth and fourteenth already drawn and accepted had been seated as members of the original jury. With the drawing and substitution of those jurors, was not the right to draw 14 jurors exhausted? I think it was, and resulted in irregularly mingling with the jury, during the hearing of the testimony, two persons whose presence was not authorized by the Alternate Juror's Act. Defendant could have protected himself against this irregularity by a timely objection, but did not do so. However, as these latter jurors took no part in the jury's delibera-

tion after it retired to consider its verdict, I think it is too late to revive that question now, after the verdict has been rendered. It certainly would have been better practice to have drawn no more jurors after the first two alternates had been substituted; but there is no suggestion in the record that their presence among the other jurors contributed in any way to an improper decision of the case by the jury that actually rendered the verdict. On both of these grounds, therefore, I concur with the decision of my colleagues that the learned trial judge committed no reversible error in permitting the challenges and substitution complained of by defendant.

Turning now to the second question, I find myself in complete disagreement with the majority of the court in its holding that it was immaterial whether Officer Ingling was killed by defendant or one of his confederates, on the one hand, or by a fellow officer on the other. If this question was material to the determination of defendant's guilt, all the evidence touching upon it not only rested entirely upon the oral testimony of the Commonwealth's witnesses, but also was sufficiently vague and uncertain to admit of the jury resolving the question in favor of defendant had it been submitted to them. Consequently, the trial judge's many times repeated charge to the jury, that it made no difference whether the deceased was killed by an officer or by one of the robbers, was clear error, unless that charge was based on sound principle or binding precedent.

The pertinent part of our murder statute, The Penal Code of June 24, 1939, P. L. 872, sec. 701, 18 PS §4701, provides that:

"All *murder* which shall be . . . committed in the perpetration of . . . robbery, . . . shall be murder in the first degree. All other kinds of murder shall be

murder in the second degree. The jury before whom any person indicted for murder shall be tried, shall, if they find such person guilty thereof, ascertain in their verdict whether the person is guilty of murder of the first or second degree."

This has been the law of Pennsylvania from the early days of our existence as an independent Commonwealth, and it is highly significant that the legislature has never seen fit to define murder by statute. It has preferred, instead, to leave the definition of the crime itself to be gathered from the well settled and carefully developed principles of the common law which have always governed this offense. The Act of 1939 adds nothing to the definition of murder, but merely divides the crime into two degrees, and places, inter alia, a murder committed in the perpetration of, or attempt to perpetrate, a robbery in the category of murders of the first degree. The act does not create any crime whatever. It takes the already existing crime of murder, which at common law was not divided into degrees, and, for purposes of punishment, sorts every murder into one or the other of two classes upon the basis of the circumstances that characterize its commission. The language of the act admits of no other rational interpretation: Vide, the statutory construction Act of 1937, which requires legal terms to be given their settled legal meaning in interpretating statutes on the presumption that the legislature intended to use them in that sense. Hence, before the act can come into operation, it must be shown that the death was a murder for which defendant is responsible in law. If it was not, the fact that the death occurred while defendant was committing a robbery does not make it a murder by him in any degree.

I must confess that I am troubled by certain decisions of our Supreme Court which hold, in effect, that

any killing during the perpetration of one of the enumerated felonies is murder of the first degree.[1] I would not have regarded such decisions as consonant with fundamental principles of interpretation. However that may be, those cases dealt with situations in which the death was caused by an act of the felon or felons, which clearly distinguishes them on their facts from the present case, and destroys them as precedents controlling the precise question here presented.

Except for the case of Commonwealth v. Moyer, 357 Pa. 181, which will hereafter be discussed at length, I know of no decision, either in Pennsylvania or elsewhere, which has held a defendant, or his accomplices, responsible for a death caused by a third person acting deliberately in direct opposition to the felons, and not in any way coöperating in furthering the criminal enterprise, merely because the felons' actions "set the stage" for the act of the third person which caused the death. The basic theory of personal responsibility for crime is, I believe, to the contrary, and is supported by abundant judicial decisions. It is an ancient and settled axiom of criminal justice, that no man shall be held *criminally* responsible for the act of another unless that other is in the position of a particeps criminis with the accused and the act is committed in furtherance of a common design.

In those jurisdictions where this principle has received the attention of the courts it has been uniformly upheld and applied. In Commonwealth v. Campbell, 7 Allen's Reports 541 (Mass.), which held that a rioter cannot be held guilty of murder or manslaughter by reason of the accidental killing of an innocent person

---

[1] Commonwealth v. Kelly, 333 Pa. 280; Commonwealth v. Lessner, 274 Pa. 108. Commonwealth v. LeGrand, 336 Pa. 511, was an appeal from the fixing of the death penalty after a plea of guilty to an indictment for murder.

by those engaged in suppressing the riot, the Massachusetts Supreme Court said:

"No person can be held guilty of homicide unless the act is either actually or constructively his, and it cannot be his act in either sense unless committed by his own hand or by some one acting in concert with him or in furtherance of a common object or purpose. Certainly that cannot be said to be an act of a party in any just sense, or on any sound legal principle, which is not only not done by him, or by anyone with whom he is associated or connected in a common enterprise, or in attempting to accomplish the same end, but is committed by a person who is his direct and immediate adversary, and who is, at the moment when the alleged criminal act is done, actually engaged in opposing and resisting him and his confederates and abettors in the accomplishment of the unlawful object for which they are united. . . . The real distinction is between acts which a man does either actually or constructively, by himself or his agents or confederates, and those which were done by others acting not in concert with him or to effect a common object, but without his knowledge or assent, either expressed or implied. For the former the law holds him strictly responsible, and for all their necessary and natural consequences, which he is rightfully deemed to have contemplated and intended. For the latter he is not liable, because they are not done by himself or by those with whom he is associated, and no design to commit them or intent to bring about the results which flow from them can be reasonably imputed to him."

Likewise in Commonwealth v. Moore, 121 Ky. 97, 88 S. W. 1085, the court, in holding a defendant not guilty of murder for the death of a bystander who was struck by a bullet fired at the accused in self-defense by the intended victim of a robbery, said:

"In order that one may be guilty of homicide, the act must be done by him actually or constructively, and that cannot be, unless the crime be committed by his own hand, or by the hands of someone acting in concert with him, or in furtherance of a common object or purpose. The defendants can in no sense be said to have aided or abetted John Young, for he was firing at them; and to hold them responsible criminally for the accidental death of a bystander, growing out of his bad aim, would be carrying the rule of criminal responsibility for the acts of others beyond all reason. Suppose, instead of killing an innocent bystander, Young had killed Moore, one of the robbers, would the survivor have been guilty of murder? And yet, if the principle sought to be maintained by the commonwealth be sound, the survivor would necessarily be guilty of murder, because the owner of the house to be robbed had killed his companion, for he could just as truly be said to have aided and abetted the owner of the house in that case as in this. Indeed, the matter could be carried still further. The dead robber would also be guilty of murder, because his part in the causation of the homicide of which he was the victim would have been precisely the same as that which resulted in the death of Anderson Young. In other words, the acts of the defendants provoked and justified the shooting on the part of John Young, and if they are criminally responsible for the accidental death of a bystander shot by Young, they would also be guilty of murder if he had killed one of themselves." See also Butler v. People, 125 Ill. 641; State v. Oxendine, 187 N. C. 658.

Save for the case of Commonwealth v. Moyer, supra, handed down by our Supreme Court in 1947, I know of no decision holding contrary to the principle laid down in the cases cited above which would not exculpate this defendant from legal responsibility for

Officer Ingling's death, if, as a matter of fact, he was killed by the bullet of a fellow officer during the exchange of fire while they were attempting to apprehend the robbers; and whether he was so killed was a question for the jury, which could have found either way under the oral evidence before it. Nevertheless, the court withdrew that question from the consideration of the jury by expressly instructing it that, even if the deceased was killed in that manner, the killing would constitute murder of the first degree by defendant. In so charging, the learned trial judge relied upon language used in the opinion in the Moyer case, and I must concede that the reasoning employed by the Supreme Court in sustaining the conviction there sustains the charge of my brother Carroll here. I have no quarrel with the result reached in the Moyer case, if the opinion is read in the light of the facts then before the court. My position is that the two cases are clearly distinguishable on their facts, that each presents a different question, that the Moyer decision upholding his conviction is thoroughly sound in law and is supported by the four decisions from other jurisdictions cited in it, but that, so far as the opinion appears to predicate the decision upon the broad ground that persons engaged in the commission of felonies are in all circumstances guilty of the murder of anyone who may die in the course of the felony, regardless of how or by whom he is killed, it went far beyond what was necessary to decide that case, and announced a wholly new theory of criminal responsibility, which is in direct conflict with established principles, and the value of which is highly questionable.

In order to justify this position a careful and detailed analysis of the Moyer decision, and a comparison of it with the facts of the present case are required. The facts in the Moyer case as given in the Supreme

Court's opinion were that, in the course of an attempted robbery of a gasoline station owned by one Shank, defendant Moyer forced Shank's employe, Zerbe, at the point of a gun to precede him toward the door of the building where Shank was. As this was occurring, Zerbe moved sufficiently to the left to enable Moyer to see Shank. Moyer then began firing at Shank, who returned the fire twice, hitting Moyer both times. Zerbe, who was still more or less between Shank and Moyer, started to run toward the corner of the building, when Moyer again began shooting. Zerbe fell mortally wounded, and the fatal bullet, which had completely penetrated his body, was found on the ground under it. Zerbe had faced Shank throughout the shooting, and the bullet found under Zerbe's body was positively identified by an agent of the Federal Bureau of Investigation as having been fired from Moyer's gun.

Practically all of these facts appeared not only in the Commonwealth's case, but also were substantially confirmed by Moyer's confession, which was admitted in evidence. In the light of them, I cannot see that they raise any question as to who actually killed Zerbe, such as is raised in the present case as to who killed Officer Ingling. But even if Zerbe had been accidentally killed by Shank, that fact did not raise the present question, because, in furtherance of the robbery Moyer had forced Zerbe at the point of his gun into the field of Shank's fire, a position of danger which resulted in his being slain. The authorities unanimously agree that such an act by a felon is a direct cause of the death that follows upon it. Thus, in Keaton v. State, 57 S. W. 1125, and Taylor v. State, 55 S. W. 961, each of which involved the killing of the same person in the same train robbery, in which, to quote the resume of the facts of those cases from the opinion in the

Moyer case, *"the defendant and others* went to rob a train, and, after stopping it, *forced the fireman to the door of the express car, after being warned that some one would probably commence shooting at them from the rear of the car*, and persons resisting the attempted robbery, and intending to kill the robbers, shot and killed the fireman", the Court of Criminal Appeals of Texas upheld the conviction of the accused robbers for murder. (Italics supplied.) So also, in Johnson v. State, 38 So. 182, it was held that one who frees the hands of an insane person, whom officers are attempting to arrest, thereby enabling him to kill one of the officers, is guilty of murder. And again, in the so-called anarchists' case, Spies et al. v. People, 122 Ill. 1, the Illinois Supreme Court, quoting from Reg. v. Sharpe, 3 Cox Crim. Cas. 288, held that "He, who inflames peoples' minds and induces them by violent means, to accomplish an illegal object, is himself a rioter, though he takes no part in the riot".

In the development of its new theory of a criminal's responsibility for the acts of third persons not associated in the criminal enterprise, the Moyer opinion cites only the four decisions in criminal cases from other jurisdictions referred to above, and it is manifest that they fall far short of supporting that theory. The facts in each of those cases disclosed the same kind of a situation as that presented in the Moyer case; that is to say, the death was the direct result of a deliberate act of the accused or his confederates, or of their liberation of an apparent homicidal lunatic, or, as in the anarchists' cases the crime was committed by persons who had been incited to riot by defendants, and I venture the conviction that the theory of the Moyer opinion on which the learned trial judge's charge was framed is wholly unsupported by these or any other judicial precedent.

The principles governing civil liability for tort spring from considerations foreign to the criminal law, and are of little help in reasoning by analogy. Though civilly responsible, in certain circumstances, for the crime of his servant, a master is not liable criminally, unless it was committed at his direction or with his knowledge and approval, and even the negligence of a tortfeasor may be transformed from a proximate into a remote cause by the intervening negligence of a third person.

Finally, I think any question of Moyer's responsibility based upon the deceased having been killed by Shank, the gasoline station owner, was entirely eliminated from that case when the verdict of guilty was rendered after a charge by the court in which the jury was twice expressly instructed, both in the charge, and in its affirmance of one of defendant's requests, as follows:

"Of course it must follow, if you would be of the opinion under all the evidence in this case that it was an accidental killing of Zerbe by Shank, it is possible that these defendants . . . may not be found guilty at all. . . ." Supreme Court's opinion, page 187. The request affirmed was:

"The defendant *is entitled to an acquittal* unless the Commonwealth has produced evidence of such a quality as to prove beyond a reasonable doubt that the bullet causing the death of the deceased was fired from the gun of either of the defendants."

Surely the verdict of guilty after such a charge conclusively established that Shank did *not* kill the deceased, but that Moyer or his associates did and rendered moot any discussion of the legal effect upon the latter's guilt of Shank's having done so.

In conclusion, I maintain, first, that Commonwealth v. Moyer, did not so settle the law of Pennsylvania

on the question with which the opinion dealt as to make it a binding precedent in this case; second, that the settled law in other jurisdictions has been held to be to the contrary, both on principle and precedent; third, that the factual question of who killed Officer Ingling was vital to the determination of defendant Almeida's guilt or innocence, and was exclusively for the jury, which alone had the right to determine it, and fourth, that it was fundamental error for the court to withdraw it from the jury by instructions which practically directed them to disregard it in their deliberations. It is not at all unlikely that a careful examination of the testimony would strongly tend to convince most minds that the jury would probably have found against defendant. But this consideration is entirely beside the point. It is not what the court en banc believes the fact to have been, but what the jury could have found, had it not, in effect, been forbidden even to consider the subject. Under our system of administering justice, the worst, as well as the best, of us are entitled to a trial according to the law of the land, and to demand that the separate functions of court and jury be scrupulously observed to the end that no man, even an Almeida, however evil and lawless he appears to have been, shall be condemned to imprisonment or death, unless every fact material to his guilt is found by a jury. In no other way can equal and impartial justice be administered to all. As was said almost a century ago by Chief Justice Black of our own Supreme Court in Commonwealth v. Sankey, 22 Pa. 390: "But even a knave must not be punished for one offense because he has been guilty of another."

For these reasons I feel compelled to dissent from the majority decision of the court.